H. & H. SUPPLY CO. et al. v. UNITED STATES.

No. 4335.

United States Court of Appeals Tenth Circuit.

Feb. 21, 1952.

Rehearing Denied March 25, 1952.

G. C. Spillers, Jr., Tulsa, Okl., and Paul Brown, Oklahoma City, Okl. (G. C. Spillers, Tulsa, Okl., on the brief), for appellants.

S. Billingsley Hill, Atty., Department of Justice, Washington, D. C. (Wm. Amory Underhill, Asst. Atty. Gen., Curtis P. Harris, Special Atty., Department of Justice, Oklahoma City, Okl., and Roger P. Marquis, Atty., Department of Justice, Washington, D. C., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

This was a condemnation proceeding instituted by the United States in the United States District Court for the Northern District of Oklahoma against the appellants, H. & H. Supply Company, a Corporation, and H. Waggoner, to acquire their interest in oil and gas leases covering 480 acres of land in Osage County, Oklahoma. A declaration of taking, accompanied by payment of $84,607, the estimated compensation, was filed in the court and this amount was paid over to appellants. Following preliminary proceedings not in issue, the cause ultimately came on for trial by jury to fix a

fair and reasonable value of the estate taken by the Government. The jury fixed the fair cash market value of the leasehold estate, as of the time of taking, at $15,000. A motion for a new trial was overruled and judgment was entered for the Government for $69,607, the difference between the amount deposited in the registry of the court and the amount of the jury's verdict, and this appeal followed.

Fourteen assignments of error are set out in the abstract, but in the brief they are all stated under the one contention that the trial court committed reversible error in admitting incompetent, irrelevant and prejudicial evidence offered by the Government, over the objections of appellants, which resulted in a grossly inadequate award of damages. This general assignment is argued under four separate contentions, which will be discussed in paragraphs, numbered 1 to 4, inclusive.

The oil and gas leases were formerly owned and operated as oil producing properties by the Blackwell Oil and Gas Company from 1940 until April 1, 1948, when they were sold together with all the operating equipment thereon to appellants for $55,000. R. C. Jones, President of Blackwell Oil and Gas Company, testified that it advertised the property for sale; that there were several bidders; that appellants were the highest bidder and that in his opinion $55,000 was the fair market value of the property when sold. In addition, David Dooley and C. V. Sidwell, two expert oil and gas witnesses, testified for the Government. Dooley valued the property at $31,000. Of that value, he ascribed $17,000 to the equipment and the balance to the value of the leases. Sidwell valued the property at $32,500. Of this value, he ascribed $20,000 to the equipment and the balance to the value of the leases. The salvage equipment was subsequently sold by appellants for $34,000. Appellants called five witnesses to establish the value of the leases. Three testified that the property was worth from $150,000 to $200,000, one that it was worth $182,750 and another that it was worth $176,700. One witness who fixed the value at from $150,000 to $200,000 testified that appellants might realize $1,000,000 net from the property.

■ 1. In the course of its opening statement to the jury, the Government stated that Blackwell Oil and Gas Company, the owner from whom appellants purchased the property, during its ownership and operation derived therefrom a net profit of $84,260. During the trial the Government was permitted to introduce in evidence a transcript in the nature of a balance sheet from the books and records of Blackwell Oil and Gas Company, purporting to show the income derived from the property during its ownership and operation thereof. In his argument to the jury, the attorney for the Government referred to the net profit which the former owner of the property derived from it. Objection was made to his statement to the jury, to the offered exhibit and to his argument to the jury, as outlined above. Each objection was overruled and error is assigned with respect to that ruling by the court. It is argued that evidence as to the profits realized by the Blackwell Oil Company was irrelevant to the issues presented to the jury for determination. The objections to this evidence and of the statements of Government's counsel to the jury with respect thereto and of his argument to the jury with respect to this evidence is that such evidence and statements by Government's counsel related to primary recovery of oil, while the question before the jury was the value of the leases for secondary recovery purposes by water-flood operations. Appellants, however, were contending that the leases had substantial value for both primary and secondary recovery purposes. They testified that they had been earning a net return of $700 per month from their operations and that the leases were being profitably operated at the time of taking. Counsel for appellants during the trial, in response to a question, stated that they were contending that the leases had substantial value for both primary and secondary recovery.

■ Profits derived from the use of property being condemned may be shown

as evidence of value.[1]  So also the price paid for property is likewise evidence of value, if not too remote in point of time.[2] Since the value of the property for both primary and secondary recovery was in issue, this evidence was properly received. There could be no objection thereto or to the statement of counsel to the jury in his opening statement or in his argument to the jury with respect to such evidence.

■  2.  The witness, Dooley, was an experienced petroleum engineer. As pointed out, he testified that the total value of the property was $35,000; that in his opinion the property had no value for secondary recovery purposes from water-flooding operations. He gave his reasons for this testimony and outlined the factors upon which he based his conclusions. On direct examination, he testified that his opinion was based upon a visit to the property in question, upon available records, the same being the department's well records, and the geology and nature of the sand. On cross-examination, he testified that the geology must be satisfactory, both with respect to the dipping of the body as well as to the configuration of the field itself; that this formation was narrow, dipping toward the South end. Continuing his cross-examination he testified that a further consideration was that contrary to some testimony his belief was that pressure had been used to inject water into the wells. Asked where he got his information, he stated that in the field he saw the equipment and that the pressurized equipment was worn out from "the running thereof" and that in addition the pumper on the lease told him that the pressurized equipment had been used. A motion to strike all of the evidence of the witness on the ground that "It was at least admittedly partially based on hearsay" was overruled. The court carefully limited the testimony to informing the jury upon what the witness had relied in reaching his conclusions.

3.  Sidwell testified that he examined this property, together with other property in

the Hulah Dam project, many times with the idea of appraising the mineral values; that he secured his information from all available sources, including, in the case of this property, information available from the Blackwell Oil and Gas Company, from its records, from its employees, from the records of the core engineers, from the records of the Osage Indian Agency—production well log records, maps and from other companies in the area that had available information on the entire field, including the leases in question. He testified that he had had experience in secondary recovery and had investigated the possibility of such recovery in this field. He likewise gave it as his opinion that the leases had no value for secondary oil recovery. The objections to Sidwell's testimony were that he "predicated his opinion on his inspection of the leases in question, plus information which he assembled from various hearsay sources"; that "he made no attempt whatsoever to differentiate between his opinion based on his personal examination or to state what the same consisted of and the other information which he assembled from various hearsay sources."

The testimony of Dooley and Sidwell with respect to the sources of their information was not offered for the purpose of establishing the truth of the information received by them. They were testifying as valuation experts and the sole purpose of this testimony was to establish the sources upon which they relied in reaching their conclusions as to value. That is also true with respect to the answer elicited on cross-examination from Dooley that a pumper on the lease had told him that pressure had been used on the wells. As pointed out, the trial court carefully stated that this answer was not admissible as establishing the substantive fact that the wells had been pressurized, but was admitted for the sole purpose of giving the information upon which the witness in part relied in reaching his conclusion as to the value of the leases.

1.  Chapman v. United States, 10 Cir., 169 F.2d 641; Stephenson Brick Co. v. United States, 5 Cir., 110 F.2d 360.

2.  Dickinson v. United States, 4 Cir., 154 F.2d 642; United States v. 13,255.53 Acres of Land, Etc., 3 Cir., 158 F.2d

It may be conceded, as contended, that both Dooley and Sidwell relied in part upon hearsay sources in reaching their conclusions as to value, but this does not make their testimony as to value inadmissible. The rule is well established that an expert may testify as to value, though his conclusions are based in part, or even entirely, upon hearsay evidence.[3]

4. Finally, it is contended that the finding of the jury fixing the value of the property at $15,000 is fantastic and not supported by substantial evidence and that the verdict and judgment constitute a gross miscarriage of justice. With this we cannot agree. Appellants' evidence of value from $150,000 to $200,000 is based in large part upon the assumption that a great deal of oil is recoverable through secondary recovery operations. One witness even testified that it was possible that $1,000,000 might be recovered through such operations. There is no positive evidence that a single barrel of oil can as a fact be recovered by such operations. The success of such operations is all a matter of opinion and speculation. Appellants' experts testified in their opinion such recovery was possible. The Government's experts, on the other hand, testified that in their opinion no such recovery was possible. The jury no doubt chose to believe the opinion evidence of the Government's witnesses, as it was warranted in doing, supported as it was by inferences and deductions from other sources. Thus, Mr. Imel, Vice President of Blackwell Oil and Gas Company testified that the company had given consideration to pressurizing the leases; that it had been discussed with other operators in the field; that he could not say that 480 acres alone could be successfully pressurized. Mr. Jones, President of Blackwell Oil and Gas Company, testified that they had given consideration to pressurizing the wells; that they had tried water-flooding without pressure in a limited way without success

and that they had caused one well to be core drilled with secondary recovery in mind. He testified that in his opinion his company got a fair price for the equipment and the lease as a whole when they sold it. From all of this, the jury may well have concluded that after having recovered oil of approximately $20,000 net value under their operations and after having sold the equipment for approximately $34,000, that the remaining value of the leasehold estate was only $15,000. This is slightly more than the Government's two expert witnesses placed upon the value of the leases.

The trial was presided over by an able and careful jurist and the case was submitted to the jury under proper instructions. He not only heard the witnesses but had the opportunity to observe them on the witness stand. Apparently, he was satisfied with the verdict, otherwise he would have granted the motion for a new trial. Under these circumstances, we should not substitute our judgment for that of the trial court, in the absence of a clear and convincing showing of a grave miscarriage of justice, and this we are unable to find.

Affirmed.

PHILLIPS, Chief Judge (dissenting).

On May 19, 1950, the United States filed its petition to condemn three oil and gas leases covering 480 acres of land situate in Osage County, Oklahoma. The leases were executed on December 17, 1938, by the Osage Tribe of Indians to Charles Petroleum Corporation and on April 15, 1948, were assigned to the H. & H. Supply Company[4] and Waggoner. The declaration of taking filed June 2, 1950, estimated the compensation at $84,607. The estimated compensation was deposited in court and by order of court was paid over to the Supply Company and Waggoner.

The jury returned a verdict fixing the just compensation for the leases, exclusive of

874; Love v. United States, 8 Cir., 141 F.2d 981; United States v. Becktold Co., 8 Cir., 129 F.2d 473.

3. 22 C.J. p. 575, 32 C.J.S., Evidence, § 545; National Bank of Commerce v. City of New Bedford, 175 Mass. 257, 56 N.E.

288; Hammond Lumber Co. v. Los Angeles County, 104 Cal.App. 235, 285 P. 896; Johnson v. City of Lowell, 240 Mass. 546, 134 N.E. 627; McElligott v. Freeland, 139 Cal.App. 143, 33 P.2d 430.

4. Hereinafter called the Supply Company.

salvage values, at $15,000. The Supply Company and Waggoner have appealed.

The Supply Company and Waggoner acquired the leases on April 1, 1948. The daily average production from the leases was 21 barrels. The production from the time the wells were drilled until April 1, 1948, was 547,586 barrels. The total production from April 1, 1948, to June 2, 1950, the date of the taking, was approximately 16,000 barrels. The average net profit during the latter period from the wells was $700 per month. The production between April 1, 1948, and June 2, 1950, was relatively stable.

The salvaged equipment was sold by the Supply Company and Waggoner for $34,000.

There is a method commonly employed in the oil industry for the recovery of additional oil after the primary production of oil has become uneconomical. By this method, water is injected into the wells under pressure and into the producing sand. The water pressure moves the oil toward the bottom of the hole and permits additional recovery. The Supply Company and Waggoner purchased the leases with the belief they could profitably increase the production from the wells by water flooding.

At the trial an issue was sharply drawn as to whether the wells on the leases were susceptible of economical secondary recovery through water flooding under pressure.

Expert witnesses for the Supply Company and Waggoner, after proper qualification and after proof of the facts upon which they based their opinion, testified that in their opinion water flooding of the wells under pressure was practical and feasible and that such water flooding would result in profitable secondary recovery.

David Dooley, an expert called on behalf of the United States, was permitted to testify that, in his opinion, the wells were not susceptible of economical secondary recovery. He stated that in his opinion the wells would not respond to water flooding sufficiently to produce profitable secondary recovery. His opinion was based, in substantial part, on records of the Blackwell Oil & Gas Company, the former owner, from which the Supply Company and Waggoner acquired the leases, and from statements made to him by pumpers in the oil field. His opinion was, therefore, based on hearsay evidence. The pumpers could have been produced as witnesses and the records could have been brought before the court and jury.

It is well settled that while an expert may base his opinion on personal knowledge gained from observation or examination, hearsay in the form of information gained from the statements of others outside the court room is not such personal knowledge and may not constitute the basis of an expert opinion.[5]

An exception is recognized when an expert is testifying as to value. He may consider the cost and price of the property, the value of sales of similar property, the result of inquiries made of others, and like matters, which would ordinarily fall in the category of hearsay.[6]

But, the opinion given by the witness Dooley that the wells were not susceptible of economical secondary recovery through water flooding was not an opinion as to value. It was as to a basic, material, and important fact, which the jury had the right to consider in arriving at its finding of just compensation. Moreover, I think the jury found from Dooley's evidence that the wells were not susceptible of economical secondary recovery. On no other basis can the verdict be rationalized.

The trial court instructed the jury that they could not consider the hearsay as establishing the facts outlined by the witness

5. Jones, Commentaries on Evidence, 2d Ed., p. 2442, § 1335; Security Benefit Ass'n v. Small, 34 Ariz. 458, 272 P. 647, 650; Foster v. Fidelity & Casualty Co., 99 Wis. 447, 75 N.W. 69, 71, 40 L.R.A. 833; Safe-Deposit & Trust Co. v. Berry, 93 Md. 560, 49 A. 401, 406; Reed v. Barlow, Tex.Civ.App., 157 S.W.2d 933, 935.

6. See McElligott v. Freeland, 139 Cal. App. 143, 33 P.2d 430, 436–437; Baltimore American Ins. Co. v. Pecos Mercantile Co., 10 Cir., 122 F.2d 143, 146; 32 C.J.S., Evidence, § 545, p. 293.

Dooley, but it could be considered as a basis for Dooley's opinion that water flooding would not result in profitable secondary recovery. In so doing, I think the court committed prejudicial error.

I would reverse with instructions to grant a new trial.