LLOYD A. FRY COMPANY, Plaintiff,

v.

UTAH AIR CONSERVATION COMMITTEE,
Defendant.

No. 13980.

Supreme Court of Utah.

Dec. 30, 1975.

**496**

Rex J. Hanson of Hanson, Wadsworth & Russon, Salt Lake City, for plaintiff.

Vernon B. Romney, Atty. Gen., John Spencer Snow, William C. Quigley, Asst. Attys. Gen., Salt Lake City, for defendant.

MAUGHAN, Justice:

On appeal is the final order of the Utah Air Conservation Committee, requiring plaintiff to submit to the executive secretary of that committee a request for variance, accompanied with a compliance schedule, or to cease operation of the facility operated by plaintiff. This matter is one of first impression here. We affirm the order of the Utah Air Conservation Committee.

The Lloyd A. Fry Roofing Company, hereinafter referred to as Fry, was notified by the executive secretary of the Utah Air Conservation Committee that it had been in violation of Section 3.2, Code of Air Conservation Regulations, governing Visible Emissions for the State of Utah. The notice gave the dates and the results of the inspections when the violations were observed. In each instance Fry was notified by the inspector that the inspection was being made and of the results of the inspection. Pursuant to the authority conferred on him by Section 26–24–11(1)(a), U.C.A.1953, as amended 1971, the secretary ordered Fry to submit, within 30 days of the receipt of the order, a request for a variance, together with a compliance schedule; or to cease operation of the facility operated by Fry in Woods Cross, Utah.

Fry responded with a denial that it had violated Section 3.2 and claimed the inspectors, in reading the vent stack plumes, had not taken into account the water vapor in the stack emission. A hearing was requested before the Utah Air Conservation Committee, as provided in Section 26–24–11(1)(a).

The hearing was held before four members of the committee, who were appointed as hearing examiners, at which extensive testimony was considered. The two basic issues were: (1) Whether an inspector could accurately read the particulate matter beyond breakpoint of a wet plume; and (2) Whether there was visible, uncombined water remaining in the plume after the breakpoint. The evidence submitted on these two issues was conflicting.

The hearing examiner found that, on the dates of inspection, the single sources of emission from Fry's plant were of a shade or density darker than No. 2, Ringelmann Chart (40% black), or were of an equivalent opacity and were thus in violation of Section 3.2.1, Visible Emissions Regulations, Code of Air Conservation Regulations.

The examiners found that the breakpoint of a wet plume (one containing visible, uncombined water) is the point where the uncombined water disappears from the plume; that the particulate matter in a wet plume can be accurately read beyond the breakpoint; and that beyond such breakpoint, a plume does not contain visible, uncombined water; that the readings of the emission from the east and west stacks of the Fry plant, at the time of the inspections, were of particulate matter; the emissions were read beyond the breakpoint and did not contain visible, uncombined water. Further findings were that the excessive emissions readings were of air contaminants within the meaning of Section

1.1.3, Code of Air Conservation Regulations; that Fry was in violation of Section 3.2, Utah Visible Emissions Regulations; that the excessive emissions were not the result of an effect of uncombined water, so as to fall within the exception of Section 3.2.6(d), of said regulations. The order of the executive secretary of the Utah Air Conservation Committee was affirmed by the examiners.

Fry then petitioned to have the order of the examiners reviewed by the Utah Air Conservation Committee. This committee affirmed in full the decision of the examiners and the order of the executive secretary. It is from this final order that Fry appeals for judicial review, pursuant to Section 26–24–12, U.C.A.1953, as amended 1971.

Fry is engaged in the manufacture of shingles. The process entails spraying hot, liquid asphalt across felt moving along through rollers. The penetration of the asphalt, through the felt, forces residual water from the felt, which is emitted as water vapor and passes up through a smoke stack. The emissions from the stack are water vapors and asphalt fumes.

A Code of Air Conservation Regulations has been adopted by the Utah Air Conservation Committee pursuant to Section 26–24–5, U.C.A.1953, as amended 1967. The following regulations are pertinent to the instant action:

1.1.3 – *Air contaminant* means any particulate matter of any gas, vapor, suspended solid, or any combination thereof, excluding steam and water vapors. [This is identical with 26–24–2(1), U.C.A.1953, as amended.]

1.1.26 – *Ringelmann Chart* means the chart published by the U. S. Bureau of Mines (Information Circular 7718) which illustrates graduated shades of gray to black for use in determining the light obscuring capability of particulate matter.

1.1.31 – *Equivalent Opacity* means the relationship of opaqueness or percent obscuration of light to the Ringelmann Chart for shades other than black and is approximately equal to the following:

| Equivalent Opacity (%) | Ringelmann No. |
|---|---|
| 20 . . . | 1 |
| 40 . . . | 2 |
| 60 . . . | 3 |
| 80 . . . | 4 |
| 100 . . . | 5 |

3.2. – Visible Emissions (effective date 4/25/71)

3.2.1 – Single sources of emission from existing installations except incinerators and internal combustion engines shall be of shade or density no darker than a No. 2 Ringelmann Chart (40% black) or an equivalent opacity except as provided in Section 3.2.6.

3.2.6 – Exceptions:

. . . . – An emission failing to meet the standard because of the effect of uncombined water shall not be in violation.

The plume from Fry's stack is characterized as a "wet plume" because of the water vapor (uncombined water) present. Fry claimed that the readings of the inspectors, which indicated an equivalent opacity in excess of 40%, did not establish a violation of Regulation Section 3.2, because its emissions were within the exception of Section 3.2.6(d). Furthermore, Fry claimed that the wet plume arising from their operation did not have a clear break, which would make it possible for a smoke reader to make a reliable reading of the emissions.

There were five witnesses, who were qualified smoke readers, who observed the violations specified. Four of the witnesses specifically testified that they read the plume beyond the breakpoint, where the moisture content had been dissipated. Fry presented three expert witnesses who testified that in the specific type of operations involved, the moisture from the plume dissipates gradually and there is no observable line of demarcation, and the smoke

readers were reading the moisture as part of the opacity of the plume. An expert witness for the state testified that in the type of operations involved, the water disappears immediately, and the balance of the plume is aerosol particulate matter, which has some opacity which can be read by a qualified smoke reader.

Fry presented evidence which indicated that by weight the emissions from the stack were 2.3% asphalt and 97.7% water. There was sharply conflicting testimony as to whether there was any correlation between the quantity of particulate matter and opacity.

Fry further presented evidence of a demonstration that it conducted before some of the enforcement personnel wherein the smoke readers observed the stack during the normal course of operations and then when the felt was broken; i.e. the felt was stopped from its run so there was no water vapor being released. However, the smoke readers determined the same level of opacity in the plume during both phases of the demonstration; the reading was 35–40, which was within the permissible limits of opacity in the regulation. Furthermore, there was conflict in the testimony of the experts as to whether this demonstration was a valid test since there was disagreement as to whether the web was an active emission surface.

From this conflicting evidence, the hearing examiners made the findings of fact. Fry vigorously urges that the findings are not supported by substantial evidence.[1] To sustain its contention, the testimony of the five smoke readers is reviewed and matters are selected which are considered favorable to this contention, a departure from regular appellate procedure. In essence, the claim is smoke reading is based on a subjective judgment of the observer without any scientific aid or equipment and is inherently unreliable. It is further claimed the readings made by the observers were conducted in a haphazard manner in which no uniform guidelines were utilized.

■ The record is replete with testimony concerning the manner in which the smoke school was conducted, the methodology of reading smoke, the qualifications of the individual smoke readers, and the procedure utilized and the state of the natural conditions at the time the readings were made. There was sufficient evidence to create an issue of fact for determination by the hearing examiners. The weight to be accorded to the testimony of the smoke readers and the conflicting testimony of the experts on the accuracy and reliability of smoke reading was within the prerogatives of the fact finders.[2]

Fry contends that this hearing was criminal in nature and the state had the burden of proving each and every element of the offense beyond a reasonable doubt. It is further urged that an essential element of the state's case was to prove that on the dates charged, the plume either contained no visible water vapor at all or such visible water vapor was taken into account and excluded when the opacity reading was made.

■ The procedure set forth in Section 26–24–11(1)(a), U.C.A.1953, as amended, clearly indicates that the instant action was an administrative procedure. As provided in the statute, Fry was notified of a violation and requested a hearing, which was held. The statute provides an alternative procedure whereby the administrative process may be bypassed and "the committee may initiate an action pursuant to section 26–24–13." In Section 13(1)(c) the committee is granted the power to institute and maintain in the name of the state any and all such enforcement proceedings. One of the enforcement proceedings is set forth in

---

1. Under Section 26–24–12(4)(b), U.C.A.1953, as amended 1971, this is one of the grounds upon which this court may set aside a final order under the Air Conservation Act.

2. *State v. Lloyd A. Fry Roofing Co.*, 9 Or. App. 189, 495 P.2d 751, 51 A.L.R.3d 1007 (1972); See 51 A.L.R.3d 1026, 1034–1036, Anno: Air Pollution: Evidence as to Ringelmann Chart Observations.

Section 26–24–13(1)(a): "Any person who violates any provision of this act, or any rule, regulation . . . or standard in force under this act . . . or who causes or permits to be caused air pollution as defined in section 26–24–2 of any air resource of the state, shall be guilty of an offense and subject to a fine of not more than $10,000 for each day of violation . . . ." The instant action was an administrative proceeding and not a criminal action and the state did not have to prove every element of the violation beyond a reasonable doubt.

█ Fry's claim that the burden of proof was upon the state to prove that the plume did not contain uncombined water is erroneous. In the Regulations adopted by the committee, Section 3.2.1 prohibits a single source of emission of a shade or density darker than a No. 2 Ringelmann Chart (40% black) or an equivalent opacity. Section 3.2.6(d) provides an exception where the emission fails to reach the standard because of the effect of uncombined water.

' An argument similar to Fry's was made in *City of St. Louis v. Eskridge,*[3] wherein defendant was charged with violating an "Air Pollution Control" ordinance. The court held that the city was not required to negate the statutory exception that the emission was not due to the "presence of uncombined water." The court observed that the exception in the ordinance was not descriptive of the offense charged but was a matter of defense contained in a separate paragraph. The court further stated that the city, although not required to do so, proved convincingly that defendant did, in fact, not come within the exception.

█ Fry contends that Regulation 3.2.1 is unconstitutional, in that it denies due process of law in contravention of Article I, Section 7, Constitution of Utah, and the Fourteenth Amendment, United States Constitution. It is urged that opacity does not equal pollution and that there was no evidence that the emissions caused any of the deleterious effects set forth in Section 26–24–2(3). Fry claims that the use of opacity limits as a legal standard violates due process on the ground that opacity cannot be measured accurately and cannot be reliably equated with pollution.

In *People v. Plywood Mfg's of California,*[4] defendant urged that a statute similar to Regulation 3.2.1 denied it due process of law. The court stated the statute did not prohibit every contaminant. To violate the statute, the contaminant must have one or both characteristics: (1) It must be as dark or darker in shade than Shade No. 2 of the Ringelmann Chart; or (2) It must have an equivalent opacity that obscures the view to a degree equal to or greater than does the smoke described in the first section. The court held that this standard was sufficiently definite to satisfy due process.[5]

Section 26–24–2 provides:

(1) "Air contaminant" means any particulate matter or any gas, vapor, suspended solid, or any combination thereof, excluding steam and water vapors.

\* \* \* \* \* \*

(3) "Air pollution" means the presence in the ambient air of one or more air contaminants in such quantities and duration and under conditions and circumstances as is or tends to be injurious to human health or welfare, animal or plant life, or property, or *would unreasonably interfere with the enjoyment of life* or use of property, as determined by the standards, rules, and regulations adopted by the air conservation committee. [Emphasis added.]

█ In response to Fry's urgence that opacity does not establish air pollution as

3. Mo.App., 486 S.W.2d 648 (1972).

4. 137 Cal.App.2d Supp. 859, 291 P.2d 587 (1955).

5. Also see 51 A.L.R.3d 1026, 1028: "Statutes and ordinances based upon Ringelmann Chart standards have repeatedly withstood constitutional challenge and their validity seems well settled."

defined in Section 26–24–2(3), the language of *City of Portland v. Lloyd A. Fry Roofing Company*[6] is particularly appropriate:

". . . But the Ringelmann Chart is an easily understood standard for testing density of smoke. And there is no mystery in such standards as opacity and obscuration. Surely it needs no expertise for defendant's officials, or anyone else, for that matter, to know that one can see half or less of the West Hills, Mt. Hood, or St. John's Bridge because of the presence of a plume of smoke. Nor does it take a post-graduate course or a Ph.D to realize that this would 'unreasonably interfere with enjoyment of life' of the people of Portland. . . ."

■ Finally, it is argued there is an improper delegation of legislative power to the committee in that under Section 26–24–10(2), the "Committee may establish such emission requirements, by rule, regulation or standards as in its judgment may be necessary to prevent, abate, or control aid pollution." Fry contends that the legislature has failed to establish sufficient standards to guide the committee.

The provisions of the entire Air Conservation Act must be considered in a determination of whether there are sufficient guidelines established.

Section 26–24–1.5 sets forth clearly the public policy and purposes of the Act. Section 26–24–2(3) defines the term "air pollution." Section 26–24–10 sets forth the procedure for the committee in adopting standards of quality for ambient air; this section requires both notice and public hearings. Section 26–24–12(2) provides for judicial review of these standards.

In *Southern Illinois Asphalt Company, Inc. v. Environmental Protection Agency*,[7] the court states:

In the case before us we are involved with air pollution control, a subject which is fairly new to the law and yet more and more important to the public welfare. By its very nature it defies the establishment of precise standards. It involves a highly specialized science, and yet covers an exceedingly broad spectrum. It is complex and not reducible to easy equations, particularly in view of our constantly growing knowledge and understanding of our environment and its effect upon our lives and our very existence. Recognizing these facts the legislature acted to prohibit or control air contamination to the extent possible in the interest of health and the enjoyment of life or property. It is true that the standards set forth are broad, but they are nonetheless adequate.

The court continued with the observation that the legislature had defined "air pollution" and "contaminants."[8] The court held that these standards were sufficient to guide the board in the enforcement of the law; and, therefore, the authority granted was not an improper delegation of legislative power.

In *Lloyd A. Fry Roofing Company v. State Department of Health*,[9] the court stated that in areas of legitimate legislative activity where precision was determined to be impossible, the courts have held such broad standards as "reasonable" and "necessary" sufficient as standards, although incapable of precise definition. The court further observed that the term "air pollution" has been deemed a standard. The court concluded that the Colorado Air Pollution Control Act of 1970 was not so broad as to result in an improper delegation of legislative authority.[10]

In *Bortz Coal Company v. Air Pollution Commission*,[11] the court, in ruling that the

6. 3 Or.App. 352, 472 P.2d 826, 829 (1970).

7. 15 Ill.App.3d 66, 303 N.E.2d 606, 611 (1973).

8. These definitions are similar to Section 26–24–2(1), (3).

9. 179 Colo. 223, 499 P.2d 1176, 1180 (1972).

10. Also see *Lloyd A. Fry Roofing Company v. Pollution Control Board*, 20 Ill.App.3d 301, 314 N.E.2d 350 (1974).

11. 2 Pa.Cmwlth. 441, 279 A.2d 388, 48 A.L.R. 3d 311 (1971).

Pennsylvania Air Pollution Control Act did not constitute an unlawful delegation of legislative authority, observed that if the regulatory agency sets forth unreasonable standards of air pollution, the citizens are protected through the appeal provisions of the act. This concept is in accord with the view expressed by 1 Davis, Administrative Law Treatise, Section 2.09, p. 113, that the law of delegation would be strengthened if the courts were to de-emphasize statutory standards and to emphasize the degree of procedural safeguards.

". . . Putting some words into a statute that a court can call a legislative standard is not a very good protection against arbitrariness. The protections that are effective are hearings with procedural safeguards, legislative supervision and judicial review. . . ."[12]

The Utah Air Conservation Act does not improperly delegate legislative power to the air conservation committee to establish standards necessary to prevent, abate, or control air pollution.[13]

ELLETT and TUCKETT, JJ., concur.

HENRIOD, C. J., and CROCKETT, J., concur in result.

12. Ib, Section 2.08, P. 108.

13. See 48 A.L.R.3d 326, Anno: Air Pollution Control: Validity of Legislation Permitting Administrative Agency to Fix Permissible Standards of Pollutant Emission.