## No. 27093

Lloyd A. Fry Roofing Company, a corporation v. The State of Colorado Department of Health Air Pollution Variance Board, and their successors in office from time to time; The State of Colorado Air Pollution Control Commission, and their successors in office from time to time; The State of Colorado Department of Health Division of Administration, and their successors in office from time to time; The Globeville Civic Association, Stapleton Community Buying Club (Inc.), NOD (Inc.), and all of the members of each thereof as members of a class represented by the persons listed on Appendix I hereto

(553 P.2d 800)

Decided August 23, 1976.           Rehearing denied September 13, 1976.

464

Rothgerber, Appel & Powers, Ira C. Rothgerber, Jr., Robert S. Slosky, for plaintiff-appellant.

J. D. MacFarlane, Attorney General, Jean Dubofsky, Deputy, Edward G. Donovan, Solicitor General, Mary J. Mullarkey, First Assistant, David K. Rees, Assistant, Gene A. Lucero, Assistant, Gregory J. Hobbs, Jr., Assistant, for defendants-appellees.

Michael L. Gilbert, for defendant-appellee The Globeville Civic Association.

*En Banc.*

MR. JUSTICE ERICKSON delivered the opinion of the Court.

On appeal, the appellant, Lloyd A. Fry Roofing Company, Inc. [hereinafter designated as Fry Roofing Company], challenges a district court order which imposed a fine and an injunction against the appellant in accordance with the "enforcement provisions" of the Air Pollution Control Act of 1970. Section 25-7-101, *et seq.*, C.R.S. 1973.[1] We affirm in part, reverse in part, and remand with directions.

Hopefully, this appeal marks the end of an uncommonly lengthy and hotly contested case. This case was commenced nearly seven years ago when the Colorado State Department of Health issued a cease and desist order directing Fry Roofing Company to cease emitting air contaminants from its plant. The order was issued pursuant to 1967 Perm. Supp., C.R.S. 1963, 66-29-10.[2] Fry Roofing Company responded by requesting a variance from the enforcement of the emission control laws. *See* 1967 Perm. Supp., C.R.S. 1963, 66-29-11.[3] This request resulted in an automatic stay of enforcement of the cease and desist order, 1967 Perm. Supp., C.R.S. 1963, 66-29-10.[4] In July, 1970, the Colorado Air Pollution Variance Board denied the request for a variance.[5] Thereafter, Fry Roofing Com-

---

[1]Previously 1971 Perm. Supp., C.R.S. 1963, 66-31-1, *et seq.*

[2]Now section 25-7-113, C.R.S. 1973.

[3]Now section 25-7-115, C.R.S. 1973.

[4]Now section 25-7-113, C.R.S. 1973.

[5]On April 10, 1970, an amended law known as the "Air Pollution Control Act of 1970" became effective. Fry Roofing Company stipulated that the provisions of this act would govern the proceedings in regard to the request for a variance. *See Lloyd A. Fry Roofing Company v. State Department of Health Air Pollution Variance Board*, 179 Colo. 223, 499 P.2d 1176 (1972). The 1970 Act repealed a series of precise air quality standards set forth in 1969 Perm. Supp., C.R.S. 1963, 66-29-4 and 5 and replaced them with broader standards. We stated in *Lloyd Fry Roofing Company v. State Department of Health Air Pollution Variance Board, supra*, that the use of the broader standards:

"demonstrates the fact that there are too many variables to make the 1969 law effective and that precise standards in the area of air pollution enactments are impractical, if not impossible to administer."

We upheld the standards as enacted by the 1970 Act and sustained the validity of a delegation of power to the Air Pollution Control Commission for the purpose of enacting more precise regulations. *Lloyd A. Fry Roofing Company v. State Department of Health Air Pollution Variance Board, supra.*

The 1970 Act contained a provision which carried over the legislatively prescribed emission standards from the previous act, designated as "temporary emission control regulations." These standards were to remain in full force and effect until modified, altered, or revoked by the commission, 1971 Perm. Supp., C.R.S. 1963, 66-31-24(1) [now section 25-7-124(1)]. Another section of the 1970 Act carried over all previously issued cease and desist orders for purposes of enforcement under the 1970 Act, 1971 Perm. Supp., C.R.S. 1963, 66-31-24(2) [now section 25-7-124(2)].

pany sought review in the district court pursuant to 1971 Perm. Supp., C.R.S. 1963, 66-31-17.[6] Fry Roofing Company challenged the constitutionality of the Air Pollution Control Act of 1970 and the actions of the variance board. Another automatic stay of enforcement was provided by the terms of the Air Pollution Control Act, 1971 Perm. Supp., C.R.S. 1963, 66-31-17(1). On May 7, 1971, the district court upheld the actions of the variance board and found the Act to be constitutional.

The district court decision was then appealed to this court. Fry Roofing Company sought a stay of execution for purposes of appeal, and on November 22, 1971, the district court entered the following order:

"Pursuant to Rule 62(c) of the Colorado Rules of Civil Procedure, this stay of execution pending appeal, is conditioned upon plaintiff posting a Twenty-Five Thousand Dollar ($25,000.00) bond, and if the Supreme Court ultimately affirms the decision of the Air Pollution Variance Board and this court, the defendants may request that the civil penalty provided in Section 66-31-19, Air Pollution Control Act of 1970 be assessed against the plaintiff for any violation of the emission standards from the date of this motion."

In our subsequent decision, *Lloyd A. Fry Roofing Company v. State Department of Health Air Pollution Variance Board, supra,* we affirmed the decision of the district court and remanded the case to that court for further proceedings. Thereafter, the State of Colorado sought to enforce the October 1969 cease and desist order by filing a motion for injunction and civil penalty in the district court. This motion is permissible in the event of a violation of a final cease and desist order which is not subject to a stay pending judicial review. 1971 Perm. Supp., C.R.S. 1963, 66-31-18 and 19.[7] The motion was later amended and retitled a petition for enforcement of final cease and desist order. Three petitioners joined in

---

[6]Now section 25-7-117, C.R.S. 1973.
[7]Now sections 25-7-118 and 25-7-119, C.R.S. 1973.
Section 66-31-18 provides:
"*66-31-18. Injunctions.* In the event any person fails to comply with a cease and desist order that is not subject to a stay pending administrative or judicial review, the commission may request the district attorney for the district in which the alleged violation exists, or the attorney general, to bring, and if so requested it shall be his duty to bring, a suit for an injunction to prevent any further or continued violation of such order. In any such suit the final findings of the division or commission, based upon evidence in the record, shall be prima facie evidence of the fact or facts found therein."
Section 66-31-19 provides:
"*66-31-19. Civil penalties.* (1) (a) Penalties shall be determined and collected by a court of competent jurisdiction upon action instituted by the division for the determination and collection of said penalty under this section, and in accordance with the following provisions:
"(b) Any person who shall violate any final cease and desist order which is not subject to a stay pending judicial review and which has been issued either pursuant to article 29 of chapter 66 prior to adoption of this article or pursuant to this article shall be subject to a civil penalty of not more than two thousand five hundred dollars per day for each day during which such violation occurs;"

the motion. They are the appellees: the State of Colorado Department of Health Air Pollution Variance Board; the State of Colorado Air Pollution Control Commission; and the State of Colorado Department of Health Division of Administration. Globeville Civic Association is an unincorporated citizen group whose members reside in the Globeville area of Denver and whose homes are in the proximity of the Fry Roofing Company plant.

The motion charged violations of a 20% opacity standard occurring after the May 7, 1971 decision of the district court. During the pendency of Fry Roofing Company's appeal for review of the variance board's decision, the air pollution control commission, pursuant to its lawfully delegated authority, adopted a visible emission regulation prescribing a 20% opacity standard which became effective March 15, 1971.[8] The commission's emission control regulation No. 1-I.A.1 provided:

"No person shall emit or cause to be emitted into the atmosphere, for any single source of emission whatsoever, any air contaminant for a period or periods aggregating more than three minutes in any 60 consecutive minutes which is of a shade or density as to obscure an observer's vision to a degree in excess of 20% opacity."

On December 9, 1971, the commission deleted the three-minute-per-hour exemption from Emission Control Regulation No. 1-I.A.1, but the 20% opacity standard remained in effect. The new Regulation No. 1-I.A.1 set forth:

"No person shall emit or cause to be emitted into the atmosphere, from any air contamination source of emission whatsoever, any air contaminant which is of such a shade or density as to obscure an observer's vision to a degree in excess of 20% opacity."

The petition for enforcement of the final cease and desist order charged separate violations of air quality standards by Fry Roofing Company under both the above regulations. The case went to trial before a jury, and on June 25, 1975, the jury returned a special verdict finding that the air contaminant emissions from the Fry Roofing Company plant exceeded the applicable 20% opacity standard on each of 83 days from July 8, 1971, through June 5, 1975. The court assessed a civil penalty of $41,500 against the appellant and entered an order enjoining the appellant from operating its plant without installing an air pollution control device approved by the State Board of Air Pollution. The trial court adopted the jury's findings as its own in the injunction portion of the action.

---

[8]The original cease and desist order issued in October 1969 cited violations of a 40% opacity standard. This standard was prescribed by state law, 1967 Perm. Supp., C.R.S. 1963, 66-29-5(2)(c).
1971 Perm. Supp., C.R.S. 1963, 66-31-9 [now section 25-7-109, C.R.S. 1973] sets forth the procedures to be followed by the air pollution control commission in prescribing standards and regulations for air quality control. The commission's authority over the matter was derived from 1971 Perm. Supp., C.R.S. 1963, 66-31-8 [now section 25-7-108, C.R.S. 1973].

The 83 violations were observed by qualified smoke inspectors from the state health department.[9] The observations were recorded on report forms, each of which supported a violation of the 20% opacity standard.[10] The observations all related to the roofing company's north stack, except for one violation which was tied to the asphalt preheater pot.

I.

## Civil or Criminal Proceeding

Fry Roofing Company contends that the civil money penalties assessed against it pursuant to section 25-7-119, C.R.S. 1973, are penal in effect and require the procedural safeguards of a criminal proceeding. We do not agree. The legislative intent to impose civil rather than criminal penalties for violation of air pollution control standards is clear from the history of the 1970 Air Pollution Control Act. The original Air Pollution Control Act, passed in 1963, contained no enforcement provisions, but only directed the state board of health to conduct studies on air pollution and to develop air quality standards. C.R.S. 1963, 66-24-1 *et seq.* In 1966, the legislature provided for enforcement of air quality standards by means of an injunction provision. 1967 Perm. Supp., C.R.S. 1963, 66-29-14. Additionally, the legislature made violation of certain emission standards a "misdemeanor" punishable by a maximum fine of $100 per day. 1967 Perm. Supp., C.R.S. 1963, 66-29-15.[11] *See also* 1969 Perm. Supp., C.R.S. 1963, 66-29-15.

In 1970, the Air Pollution Control Act was amended to provide that the task of promulgating ambient air quality standards and emission control regulations should be delegated to the air pollution control commission. 1971 Perm. Supp., C.R.S. 1963, 66-31-7. Additionally, the monetary penalty section was redesignated as a civil penalty section rather than as a criminal penalty section. 1971 Perm. Supp., C.R.S. 1963, 66-31-19.

---

[9]The inspectors were "certified" to evaluate the opacity of smoke at a state sponsored smoke reading school.

[10]Several of the readings were made when the three-minute limitation was in effect under Air Pollution Control Commission Regulation No. 1-I.A.1. The great majority, however, were made after the three-minute standard had been eliminated.

All readings exceeded 30% opacity according to the testimony adduced at the hearing. This was well within the average margin of error of 7-1/2%, the standard deviation factor permissible for certification at the state smoke reading school.

[11]Section 66-29-15 provides:

"*Penalties.* — (1) Subject to such variances as may be issued pursuant to this article, any person who in any designated area of the state shall violate any of the emission standards specified in this article and effective in such area, shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than one hundred dollars. Each day during which such a violation occurs shall constitute a separate offense.

"(2) Subject to such variances as may be issued pursuant to a local air pollution law, any person who shall violate any emission standard specified in any local air pollution law, within the jurisdiction of the local governmental unit enacting the same, shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than one hundred dollars. Each day during which such a violation occurs shall constitute a separate offense."

The redesignation of the enforcement section is consistent with the delegation of power to the administrative agency. The express language of the new enforcement provisions belies any contention that the legislature intended this section to effect criminal rather than civil penalties. In view of the clear expression of legislative intent, we need not apply the criteria set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed. 2d 644 (1963), for determining whether sanctions are penal or regulatory in nature.[12] That civil penalties may be enacted to enforce observance of a legislative policy is a principle too well established to require discussion. *See, for example, Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938); *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013 (1909); *Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 518 F.2d 990 (5th Cir. 1975), *appeal docketed*, No. 75-746, 5th Cir., Nov. 21, 1975; *Frank Irey, J., Inc. v. Occupational Safety and Health Review Comm'n*, 519 F.2d 1200 (3d Cir. 1974); *United States v. J. B. Williams Co., Inc.*, 498 F.2d 414 (2d Cir. 1974).

## II.
### Assessment of the Civil Penalty by the Court

The state agreed to Fry Roofing Company's demand for a jury trial, although a jury trial was not required as a matter of law. *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Setchell v. Dellacroce*, 169 Colo. 212, 454 P.2d 804 (1969); *see also Murray v. District Court*, 189 Colo. 217, 539 P.2d 1254 (1975); C.R.C.P. 38(a) and 39(c). The jury tried the disputed issues of fact, but the court determined the amount of the civil penalty. Section 25-7-119(1) provides that "[p]enalties shall be determined and collected by a court of competent jurisdiction." The Air Pollution Control Act contains no provision for trial by a jury or for penalty assessment by a jury. Thus, we do not perceive that the trial court abused its discretion in fixing the amount of the penalty. *United States v. J. B. Williams Company, Inc., supra; United States v. I.T.T. Continental Baking Co.*, 485 F.2d 16 (10th Cir. 1973), *rev'd on other grounds, United States v. I.T.T. Continental Baking Co.*, 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975).

---

[12]The criteria were summarized in *Atlas Roofing Co. v. Occupational Safety and Health Review Commission, United States Department of Labor*, 518 F.2d 990 (5th Cir. 1975), *appeal docketed*, No. 75-746, 5th Cir., Nov. 21, 1975:

"[I] Whether the sanction involves an affirmative disability or restraint, [II] whether it has historically been regarded as a punishment, [III] whether it comes into play only on a finding of scienter, [IV] whether its operation will promote the traditional aims of punishment — retribution and deterrence, [V] whether the behavior to which it applies is already a crime, [VI] whether an alternative purpose to which it may rationally be connected is assignable for it, and [VII] whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry. . . ."

## III.
### Reliability of Testing Procedure

■ Fry Roofing Company produces roofing shingles by saturating heavy felt paper with hot liquid asphalt. During the process, a certain amount of moisture is generated as the asphalt, penetrating the felt, forces residual water from the felt. The water immediately becomes water vapor which travels up through the smoke stack. The only other emission from the stack is submicron asphalt fumes in the aerosol and solid particle form. The aerosols and particles are "particulate matter," defined by commission regulations as an air contaminant. Air Pollution Control Commission Regulation 1. VIII, adopted January 14, 1971; *see also* section 66-31-3(2), C.R.S. 1963.

The water vapor may condense into steam condensate which becomes visible as it leaves the stack. Steam condensate is not an air contaminant. In the event an inspector is viewing a "wet plume" (one carrying both visible water droplets, *i.e.*, steam condensate, and particulate matter), the inspector must read the plume beyond the "break point," the point beyond which the visible water has evaporated back into the ambient atmosphere. At times, the relative humidity of the ambient air may be so low, that condensation may not occur and the moisture from a stack will be immediately absorbed into the ambient air. In such cases, steam condensate would not be visible. Three inspectors from the state testified that during the 83 days that they observed violations at the Fry Roofing Company plant, they did not observe any visible water.

The inspectors from the health department conducted visual opacity readings at the Fry Roofing Company plant. Inasmuch as the emissions from Fry's stacks are not black, the Ringelmann Chart was not used.[13] Instead, the inspectors relied on the visual opacity test — designed for evaluation of white smoke — which requires that the inspector estimate the percentage of obscuration of light caused by the plume of smoke. The validity of either this method or the Ringelmann test has been upheld in several courts. *Lloyd A. Fry Roofing Company v. State*, 524 S.W.2d 313 (Tex. Civ. App. 1975); *Lloyd A. Fry Company v. Utah Air Conservation Committee*, Utah, 545 P.2d 495 (1975); *Sittner v. Seattle*, 62 Wash.2d 834, 384 P.2d 859 (1963); *People v. Plywood Mfgrs.*, 137 Cal.App.2d Supp. 859, 291 P.2d 587 (1955); *State v. Mundet Cork Corp.*, 8 N.J. 359, 86

---

[13]The Ringelmann Chart is used to measure the density of black smoke. It consists of a plain white piece of paper divided into four sections, numbered from 1 to 4. Each section is progressively darker in shade than the previous section. An estimation of the density of smoke is made by comparing the various sections on the chart with the smoke and then selecting that section which most nearly resembles the smoke. *People v. International Steel Corp.*, 102 Cal.App.2d Supp. 935, 226 P.2d 587 (1951).

A.2d 1 (1952); *People v. International Steel Corp.*, 102 Cal. App. 2d Supp. 935, 226 P.2d 587 (1951); *Penn-Dixie v. City of Kingsport,* 189 Tenn. 450, 225 S.W.2d 270 (1949).

■ The record is replete with testimony concerning the qualifications of the health inspectors and the methodology of reading smoke. The inspectors observed uniform guidelines in conducting the visual opacity tests — standing a certain distance from the smoke stack, positioning themselves in accordance with the sun, and noting the natural conditions at the time of the readings. "The weight to be accorded to the testimony of the smoke readers . . . was within the prerogatives of the fact finders." *Lloyd A. Fry Roofing Co. v. Utah Air Conservation Committee, supra*; *People v. International Steel Corp., supra*; *Annot., Air Pollution: Evidence as to Ringelmann Chart Observations,* 51 A.L.R.3d 1026. Appellant complains that visible water would have interfered with the inspectors' observations of the smoke stacks. This question was thoroughly explored at the hearing, and the issue was resolved against the appellant. The weight to be accorded to the testimony of the inspectors was within the exclusive prerogative of the trier of fact. *See* our companion decision, *Air Pollution Variance Board v. Western Alfalfa Corp.,* 191 Colo. 455, 553 P.2d 811.

## IV.
### Requirement of Finding Irreparable Injury

Fry Roofing Company contends that the injunction issued by the district court is fatally deficient because the court made no finding that irreparable harm would result unless the injunction was issued. The following remarks of the trial court constitute the sole factual findings supporting the issuance of the injunction:

"Now, as to the injunction the Court finds that there was ample testimony and evidence in the case to justify the verdict of the jury; that the Court finds that the Fry Roofing Company was in violation of the State of Colorado law as to air pollution; that it was in violation of the cease and desist order ordered by the Air Pollution Board; and that they have had some four years to comply; that they made a half-hearted effort to comply by submitting plans or specifications for a so-called scrubbing operation which was unacceptable by the Air Pollution Board, which by the way, the statute says must approve it. It must be approved by the State Board."

The granting of the injunction in this case was governed by section 25-7-118, C.R.S. 1973, one of the two enforcement provisions of the Air Pollution Control Act of 1970. Section 25-7-118 provides that an injunction may be ordered "[i]n the event any person fails to comply with a cease and desist order that is not subject to a stay pending administrative or judicial review. . . ." *See also Lloyd A. Fry Roofing Co. v. State,* 179 Colo. 223, 499 P.2d 1176 (1972).

■ The terms of the statute do not dictate that a showing of irreparable injury must be made prior to the granting of an injunction. Several courts have held, in varying contexts, that irreparable injury need not be shown when the injunction is sought pursuant to statute rather than by the rules of civil procedure. *Environmental Defense Fund v. Froehlke*, 477 F.2d 1033 (8th Cir. 1973); *Murry v. American Standard, Inc.*, 488 F.2d 529 (5th Cir. 1973); *United States v. Central Carolina Bank and Trust Co.*, 431 F.2d 972 (4th Cir. 1970); *United States v. Hayes International Corp.*, 415 F.2d 1038 (5th Cir. 1969); *S.E.C. v. Globus International Ltd.*, 320 F. Supp. 158 (D.S.D. N.Y.1970); *United States v. Ingersoll-Rand Co.*, 218 F. Supp. 530 (W.D. Pa. 1963); *aff'd* 320 F.2d 509 (3d Cir. 1963). Analoquously, this court has held that "it is not necessary to prove irreparable injury or threat thereof, where the suit is in behalf of the public." *Conway-Bogue v. Bar Association*, 135 Colo. 398, 312 P.2d 998 (1957); *see also Hecht v. Bowles*, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

■ The legislative declaration of policy contained in section 25-7-102, C.R.S. 1973 of the Air Pollution Control Act of 1970 states that the Act is intended to promote the public health, welfare, convenience, and comfort by attempting to "achieve the maximum practical degree of air purity in every portion of the state." Moreover, the section concludes that the "prevention, abatement, and control of air pollution . . . are matters of statewide concern and are affected with a public interest. . . ." The injunction which was sought in this case was sought in behalf of the public, following 83 specific violations of Colorado air quality standards. The acts which the state is attempting to enjoin in this suit are imbued with great public importance. A violation of the air quality standards embodies, in any case, sufficient injury to the public interest to permit the injunctive remedy.

■ Fry Roofing Company argues that C.R.C.P. 65(d) controls the granting of this injunction and that the form and scope of the injunction in this case violates the standards set forth in that rule. This proceeding, however, is a special statutory proceeding, and, therefore, any inconsistency between C.R.C.P. 65(d) and section 25-7-102, C.R.S. 1973, is resolved in favor of the statutory section. C.R.C.P. 81(a); *Brown v. Hansen*, 177 Colo. 39, 493 P.2d 1086 (1972); *City of Westminster v. District Court*, 167 Colo. 263, 447 P.2d 537 (1968). In view of the stated public policy of the Act and the express criteria provided by section 25-7-118, C.R.S. 1973, we hold that no showing of irreparable injury must be made prior to the granting of an injunction under this Act.

## V.

### Admission of Alleged Hearsay Evidence

■ Appellant objects to the admission of various weather charts and relative humidity readings which furnished the foundation for the

testimony of the state's principal expert witness, Mr. Luedtke, and which were offered during the testimony of a Mr. Ratallack. The testimony of Mr. Luedtke related to the question of whether any visible water (steam condensate) was in the Fry Roofing Company plume on 79 of the days during which violations occurred. Part of the information which Mr. Luedtke used to formulate his opinion that no visible water was present was obtained over the telephone from state meteorologist Retallack. Other information was obtained from certified Weather Bureau reports and the inspection reports of health department inspectors. We see no error in the use of this information by Mr. Luedtke. *See H & H Supply Company v. United States*, 194 F.2d 553 (10th Cir. 1952); *United States v. Musgrave*, 483 F.2d 327 (5th Cir. 1973), *cert. denied*, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973); *United States v. Williams*, 447 F.2d 1285 (5th Cir. 1971); *Birdsell v. United States*, 346 F.2d 775 (5th Cir. 1965). *See generally*, C.R.C.P. 43(a).

## VI.
### Selective Enforcement of the Laws

Finally, Fry Roofing Company claims that it was denied equal protection of law by reason of selective and discriminatory enforcement of the state air pollution laws against it. In particular, appellant contends that the health department intentionally failed to give notice of inspections of appellant's plant, thereby enforcing the law in a discriminatory manner.

The only evidence supporting the appellant's claim is that prior to the spring of 1975, the company was not notified of readings made from outside its premises. The record supports the conclusion that efforts of conciliation between the department of health and Fry Roofing Company had broken down by the time the cease and desist order was issued in October 1969. Moreover, Fry Roofing Company refused to allow inspectors from the department of health to enter its premises after the issuance of the cease and desist order.

We are not convinced that Fry Roofing Company was the only company not receiving notification of inspections prior to the spring of 1975. *See, e.g., Air Pollution Variance Board v. Western Alfalfa Corp.*, 191 Colo. 455, 553 P.2d 811. Following the second Court of Appeals' decision in *Western Alfalfa Corp. v. Air Pollution Variance Board*, 35 Colo. App. 207, 534 P.2d 796 (1975), the department of health instituted a new notification procedure, and thereafter, most, if not all of the inspections at the Lloyd Fry Roofing Company included notice of the inspector's presence and observations. Appellant has not, in our opinion, presented sufficient proof that it was subject to invidious discrimination through unequal enforcement of the laws. In *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962), the Supreme Court of the United States said: "[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case

might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged."

Officials of the department of health presumably performed their tasks in a regular manner, and the burden of proof rests upon the appellant to rebut the presumption. *See generally, Tollett v. Laman*, 497 F.2d 1231 (8th Cir. 1974); *United States v. Berrigan*, 482 F.2d 171 (3d Cir. 1973); *People v. Gray*, 254 Cal. App.2d 256, 63 Cal.Rptr. 211 (1967).

Appellant in this case has failed to make a colorable showing of "systematic discrimination," *United States v. Robinson*, 311 F.Supp. 1063 (W.D. Mo. 1969), or "unjust and illegal discrimination between persons in similar circumstances," *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The district court properly refused an evidentiary hearing on the issue. *United States v. Berrigan, supra.*

## VII.

### Right to Notice of Inspection

Fry Roofing Company contends that it was denied due process of law because of the failure of the health department inspectors to notify it that visual opacity tests were being conducted on or near the company's premises. In our companion case of *Air Pollution Variance Board v. Western Alfalfa Corporation*, 191 Colo. 455, 553 P.2d 811, we declared that a party who is subject to an inspection that may result in a cease and desist order is entitled to notice that an inspection has been conducted within a reasonably short period of time following the inspection. *See also* Comment, *Requirement of Notice in Visual Opacity Readings*, 51 Denver L.J. 603 (1974). In that case, a two-week interval of time between the inspection and the notification of the cease and desist order was determined to be unreasonably long, and the company was thereby foreclosed from presenting meaningful rebuttal evidence.

The fact that Fry Roofing Company was already the subject of a cease and desist order, which was affirmed by the district court prior to the time the first violation was noted, does not meaningfully distinguish this case from the *Western Alfalfa* case. If individual notice is required as to each inspection conducted prior to the issuance of a cease and desist order, then no reason exists for denying such notice as to those inspections which follow the issuance of a cease and desist order. Notice of each inspection is required, regardless of when it occurs. The department of health at one time wrote a letter to the appellant warning it that inspections would be made on a daily basis, but the inspection reports do not bear out the fact that the department of health followed through on this warning.

The majority of the inspections at Fry Roofing Company were conducted without giving the appellant notice, although a few exceptions may be noted. In the spring of 1975, several inspections were followed by notification to either the plant manager or the office manager of Fry Roofing Company that an inspection had just been completed. The violations noted on April 15, 1975, April 21, 1975, April 29, 1975, May 12, 1975, June 4, 1975, and June 5, 1975, were accompanied by notice that was sufficient in our opinion to adequately advise Fry Roofing Company of the inspections occurring on those dates.

The trial court was free to accept or reject the findings of the advisory jury,[14] but elected to approve their factual conclusions. More particularly, the jury's findings that Fry Roofing Company violated state air quality standards on each of the six days specifically mentioned above was accepted by the trial court. Inasmuch as notice was given shortly after the observation of these violations by department of health inspectors, the trial court may assess civil penalties against Fry Roofing Company for these violations in an amount appropriate under section 25-7-119, C.R.S. 1973. Article II, Section 25 of the Constitution of the State of Colorado, as well as our holding in *Western Alfalfa Corporation v. Air Pollution Variance Board, supra*, commands that the remaining violations be dismissed and that the civil penalties be reduced accordingly.

The record reflects evidence which is sufficient to support the granting of the injunction pursuant to section 25-7-118, C.R.S. 1973, on the basis of violations which we have determined to be constitutionally sustainable.

The remaining contentions of the appellant are either without merit or are not properly postured for review.

Accordingly, the judgment is affirmed in part, reversed in part, and remanded with the directions included herein.

MR. JUSTICE GROVES dissents.

MR. JUSTICE GROVES dissenting:

I respectfully dissent. In the light of the fact that the majority opinion has invalidated approximately 93% of the alleged violations as constituting a basis for civil penalties, the trial court should be permitted again to rule on the question of whether the injunction should be issued.

---

[14]Fry Roofing Company requested that a jury determine the civil penalties, but the state resisted. Inasmuch as this was a non-jury case, the court's granting of Fry Roofing Company's request resulted in the jury serving in an advisory capacity only. *Young v. Colorado National Bank*, 148 Colo. 104, 365 P.2d 701 (1961); C.R.C.P. 39(c). Similarly, the injunction issue is equitable in nature, and as such, the jury's findings relating to this issue were advisory only. *McKelvy v. Cooper*, 165 Colo. 102, 437 P.2d 346 (1968).