Thomas A. KOURLIS, Commissioner of
Agriculture, Colorado Department
of Agriculture, Petitioner,

v.

DISTRICT COURT, EL PASO COUNTY;
Colorado Animal Refuge, Inc., a Sus-
pended Colorado Corporation; and
Mary Port, Respondents.

No. 96SA355.

Supreme Court of Colorado,
En Banc.

Jan. 13, 1997.

Rehearing Denied Feb. 18, 1997.

**1330**

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Richard Westfall, Solicitor General, Merrill Shields, Deputy Attorney General, Richard Djokic, First Assistant Attorney General, Katie Troudt Riley, Assistant Attorney General, Richard Delliveneri, Assistant Attorney General, Regulatory Law Section, Denver, for Petitioner.

William M. Schoewe, Colorado Springs, for Respondent.

Justice HOBBS delivered the Opinion of the Court.

■ This original proceeding is brought pursuant to C.A.R. 21 by the Commissioner of Agriculture (the Commissioner) to review the August 20, 1996 order of the El Paso County District Court denying the Commissioner's motion for entry of a temporary restraining order.[1] The Commissioner sought to enforce a cease and desist order against respondents Colorado Animal Refuge, Inc. and Mary Port for temporary restraining order and injunctive relief under

section 35–80–111(3), 14 C.R.S. (1995), against operation of an animal care facility without a license, as required by section 35–80–104, 14 C.R.S. (1995), of the Pet Animal Care and Facilities Act (the Act), §§ 35–80–101 to –117, 14 C.R.S. (1995). This court issued a rule to show cause why the requested relief should not be granted. We make the rule absolute.

I.

The Pet Animal Care Facility Program of the Department of Agriculture (the Department) is operated pursuant to the Act. Associate State Veterinarian, Dr. Keith Roehr, D.V.M. (Roehr), oversees licensing procedures for animal pet care facilities [2] and performs inspections for the Commissioner. Section 35–80–104 requires that all pet animal facilities be licensed by the state.[3] Each location of a pet animal facility, in this case a shelter housing more than twenty-four pet animals, is required to be separately licensed, § 35–80–105(2), and licenses are not transferrable from one location to another, § 35–80–105(7).

In early 1996, Roehr learned that Mary Port, operator of Colorado Animal Refuge, Inc. (CARI), a non-profit organization supported by donations, planned to open a new pet care facility in Ellicott, El Paso County, Colorado, to replace a licensed facility that had suffered extensive fire damage.[4] The

1. This court has original jurisdiction under C.A.R. 21 to review whether a trial court exceeded its jurisdiction or abused its discretion when an appellate remedy would be inadequate. *Hawkinson v. Biddle*, 880 P.2d 748, 748 (Colo.1994).

2. Section 35–80–102(11) states:
"Pet animal facility" means any place or premise used in whole or in part, which part is used for the keeping of pet animals for the purpose of adoption, breeding, boarding, grooming, handling, selling, sheltering, trading or otherwise transferring such animals. "Pet animal facility" also includes any individual animals kept by such a facility as breeding stock, such licensing of individual breeding stock to be inclusive in the pet animal facility license. "Pet animal facility" shall not mean a common carrier engaged in intrastate or interstate commerce.

3. Section 35–80–104 provides: "Any person operating a pet animal facility shall possess a valid pet animal facility license issued by the commis-

sioner in accordance with this article and any rules and regulations adopted by the commissioner in accordance with the provisions of this article."

4. CARI's facility by the same name at Simla, Elbert County, Colorado, was issued a license in approximately April 1995. Licensure occurred in connection with the "start-up" of the program whereby existing facilities were deemed licensed while individual applications were being processed. In March of 1995 the Department first began to accept applications for licenses. Because over one thousand then-existing pet animal care facilities required a license under the Act, the Department initially provided "blanket" licensure upon receipt of an application and fee. Subsequent inspections of these pre-existing, licensed facilities followed and, generally, those that were not in compliance had their licenses suspended or revoked. The Department also worked with licensees to keep them in compliance. Upon inspection, the facility at Simla,

new facility, actually an old dairy farm, had no running water, no isolation or quarantine area, no drainage, and lacked adequate facilities and operating procedures to clean and care for animals housed at the facility.

On February 9, 1996, Roehr began pre-licensure inspections of the new facility to which Mary Port had transferred animals that had survived the fire at the licensed facility and subsequently brought others. The Department agreed to give Mary Port time to bring the buildings up to compliance in order to become licensed as required by section 35–80–104. Roehr advised Port that during the remainder of the winter months prior to the spring of 1996, she might use the dairy barn for housing animals. After March 21, that facility was not to be used to house animals until it complied with licensure requirements of the Act. Among his many recommendations,[5] Roehr directed that the number of dogs on the property, approximately one hundred and fifty, should not be increased because of overcrowding in violation of the Act and implementing regulations.

Roehr returned to make a follow-up visit approximately six weeks later on March 27, 1996, and found continuing substantial violations. In his inspection report, Roehr identified the actions that Port needed to take in order to meet licensing requirements: first, discontinue the use of the house and barn to shelter animals until the structures met the Act's licensing requirements; second, decrease the number of animals at the facility to one hundred, the maximum that the existing facility could lawfully accommodate; third, build the perimeter fence previously

requested. The remaining improvements necessary to bring the facility into compliance were noted as a fourth category.[6]

On April 18, 1996, Roehr conducted a third pre-licensure inspection. He noted that there were no improvements, as requested, since the previous inspection; rather, new and continuing deficiencies existed. For example, the dog population had increased to approximately one hundred and ninety-five, the fenced-in area around Port's home was being used as a kennel for approximately fifty to sixty dogs, rooms in the dairy barn and house were continuing to be used to house dogs, the dairy barn area had not been cleaned and disinfected, the requested gravel had not been put down, dog food on the ground was creating a rodent feeding area, and no shade or overhead protection against the sun was provided in the outdoor kennels. Additionally, CARI had not provided the Department with records of the facility's operation. Roehr again wrote out a report citing violations and providing his recommendations to CARI for meeting licensure requirements. The notice was left with the person in charge of the facility, and sent by mail and facsimile.

On May 22, 1996, Roehr inspected the facility and noted that major violations were continuing and were becoming more serious with the advent of hot weather.[7] On the date of the last inspection, Roehr served Mary Port with a cease and desist order that directed her to cease operating the pet care facility without the license required by section 35–80–104.[8]

Elbert County, was found not to be in compliance with the Act, in large measure because of a devastating fire that occurred in early April 1995. Efforts to bring the Simla facility into compliance were unsuccessful.

5. For example, other licensure requirements set forth as a result of the inspection included limiting the number of dogs per kennel to five, building a perimeter fence for the facility, building a shaded area, alleviating strong odors in the dairy barn caused from buildup of urine and fecal material, and creating records for each animal housed at the facility.

6. Roehr recommended for example that: gravel be placed over the bottom portion of a fence as protection for animal footpads; open and torn food storage bags be placed in rodent-proof containers; rooms in the dairy barn be cleaned and

disinfected to prevent damage to mucous membranes from the strong ammonia odor; and records be kept as required by § 35–80–107 and the regulations.

7. Roehr noted in his report that no shade was being provided in the outdoor kennels; the house and barn were still being used to house animals; the food storage area in the barn was continuing to present a rodent problem; there was a buildup of fecal material in the corner of the food storage room; no progress had been made toward the construction of the perimeter fence; no gravel substrate had been put down as required; and no records of the animals were being kept or were available for review.

8. The cease and desist order stated:
PURSUANT TO SECTION 35–80–104 C.R.S., you are ordered to CEASE AND DESIST vio-

Thirteen days later, on June 4, 1996, after learning that CARI was continuing to operate the facility despite the agency order, the Commissioner sought a temporary restraining order and preliminary and permanent injunctive relief in El Paso County District Court in accordance with the enforcement provisions of section 35–80–111. An evidentiary hearing was held on the motion for temporary restraining order over the course of a five-day period of trial commencing in July and ending August 15, 1996. In its August 20, 1996 Order denying the Commissioner's request for relief, the district court observed that CARI was not in compliance

lating the Pet Animal Care Facilities Act (PACFA), State Statute 35–80–101 through 117.

You are presently operating a pet animal care facility without the required PACFA license, violating the Act and the rules and regulations thereto as follows:

STATE STATUTE 35–80–104: Any person operating a pet animal facility shall possess a valid pet animal facility license issued by the commissioner in accordance with this article and any rules and regulations adopted by the commissioner in accordance with the provisions of this article.

YOU ARE ORDERED TO CEASE AND DESIST OPERATION OF THIS PET ANIMAL FACILITY FORTHWITH, unless and until you are licensed pursuant to PACFA and the rules and regulations thereto.

YOU ARE NOTIFIED that you may request in writing, a hearing, on the question of whether any violation has occurred. If so requested, a prompt hearing pursuant to the provisions of the Pet Animal Care Facilities Act and article 4 of title 24, CRS, shall be held to determine whether or not such violation has occurred. In the event of your failure to comply with this CEASE AND DESIST ORDER, pursuant to State Statute 35–80–111 2(b), the commissioner may bring suit for a temporary restraining order and for injunctive relief to prevent any further or continued violation of this Act.

SO ORDERED THIS 22nd day of May, 1996.

9. The district court's order denying the temporary restraining order recited, in part, that:

The Motion for Temporary Restraining Order is Denied. In making this order, the Court acknowledges that the power to issue an injunction should be exercised with great discretion only when necessity requires it. *McLean v. Farmers' Highline Canal & Reservoir Co.,* 44 Colo. 184, 98 P. 16 (1908). Trial Courts have considerable latitude in injunction cases. *Brennan v. Monson* [,] 97 Colo. 448, 50 P.2d 534 (Colo.1935). In exercising its discretion the trial court must find among other elements that the moving party has demonstrated a rea-

with the license requirements of the Act. Nevertheless, the court denied the requested relief, determining that the Commissioner had failed to establish three elements requisite to granting the relief requested: (1) that there existed a reasonable probability of success on the merits; (2) that the balance of the equities favored an injunction; (3) that granting an injunction would not disserve the public interest.[9]

The district court found that CARI had made good faith efforts towards compliance and, in the future, likely would be able to bring the facility into compliance. The court did not set a hearing on the Commissioner's motion for a preliminary injunction but, in-

sonable probability of success on the underlying merits, that the balance of equities favors the injunction, and that the granting of the injunction will not disserve the public interest. *Rathke v. MacFarlane,* 648 P.2d 648 (Colo. 1982). The Court is not persuaded that the Plaintiff has proved the existence of these three elements to justify the imposition of the temporary restraining order.

Although the current facility in Ellicott, Colorado is not in full compliance with the Pet Animal Care and Facilities Act, 1973 C.R.S. 35–80–101 et. seq. (1995) (hereinafter "PACFA") the Court was persuaded that with additional time the Defendant will be able to bring the current facility into compliance with PACFA and its required licensure. The Court was persuaded that the Defendants[,] Port and Colorado Animal Refuse [sic], Inc. have made significant, good faith efforts to bring the current facility into compliance with PACFA standards particularly regarding the immediate needs of smaller, multiple pens, shading for enclosed animals, ongoing adoption efforts and improved record keeping. In addition, there was competent testimony as to the future installation of a perimeter fence, an appropriate heated facility for the winter months, and improved lighting and cleanliness for the central facility. In particular, the Court was persuaded by the testimony that the number of individual pens had multiplied to more than 40 in the last several months, the unrebutted testimony that there is work performed at the facility on a daily basis, and the testimony that hundreds of animals had been placed into adoption since the relocation of the facility to Ellicott.

. . . .

For the foregoing reasons, the Motion for Temporary Restraining Order is Denied. The parties are ordered to set this matter for hearing on the issue of permanent injunction after January 1, 1997 at which time the Court will receive proof as to whether the facility is properly licensed and in compliance with applicable laws.

stead, ordered that the Commissioner's motion for permanent injunction be heard sometime after January 1, 1997. Although the district court's order recites denial only of a temporary restraining order, the court employed the C.R.C.P. 65 (Rule 65) discretionary standards applicable to preliminary injunctions in reaching this result, and said that it would consider the request for permanent injunction some time after January 1, 1997. In any event, the Commissioner's motion for preliminary injunction was either not granted or not acted upon and, for purposes of this opinion, we treat the court's order as denying the Commissioner's motions for temporary restraining order and preliminary injunction.

The effect of the court's ruling was that CARI was allowed to continue operation of the facility, in violation of the license requirement of section 35–80–104, for at least four and one-half months after the court's order denying the Commissioner's request for relief under the statute. Under the circumstances, the court's refusal to grant the requested injunctive relief to enforce the Commissioner's cease and desist order was tantamount to entering a preliminary injunction in favor of the unlicensed facility against the Commissioner, pending a yet-unscheduled hearing to occur some time after the commencement of 1997.

The issue before this court is whether the district court abused its discretion under the circumstances of this case by failing to grant the requested relief to enforce the statute's licensure requirement.

## II.

■ The General Assembly may prohibit practice of a profession or operation of a facility in the absence of a statutorily-pre-scribed license or permit. *See People v. Rosburg,* 805 P.2d 432, 440 (Colo.1991) (enjoining practice of midwifery in the absence of a license); *see also* § 25–7–114.2, 11A C.R.S. (1996 Supp.) (prohibiting construction of new stationary air pollution source in absence of permit); § 25–7–114.3, 11A C.R.S. (1996 Supp.) (prohibiting operation of specified air pollution sources in absence of renewable operating permit); § 25–8–501, 11A C.R.S. (1996 Supp.) (prohibiting discharge of pollutants into state waters without permit).

The test usually applicable for injunctions under Rule 65 is set forth in *Rathke v. MacFarlane,* 648 P.2d 648, 653–54 (Colo. 1982); however, different statutory provisions for enforcement through injunctive relief may form an integral part of the legislative design of a particular enactment.[10] *See* 12 Debra Knapp, *Colorado Civil Procedure Forms and Commentary* § 65.3 (1996). Such provisions are fashioned by the General Assembly to effectuate properly issued agency enforcement orders. *See Lloyd A. Fry Roofing Co. v. State Dep't of Health Air Pollution Variance Bd.,* 191 Colo. 463, 473, 553 P.2d 800, 808 (1976) (upholding injunction issued to enforce statutory purpose in absence of demonstrating irreparable injury).[11] Our task is to examine and give effect to the statutory provisions before us.

## A.

■ Under C.A.R. 21, this court may set aside a lower court order allowing a person or entity to operate without a license, when the lower tribunal has abused its discretion or acted outside of its jurisdiction to defeat exercise of the agency's authority delegated to it by the legislature. Due regard for the agency's role in carrying out the legislative

---

10. *Rathke* did not involve a statutory injunction pursuant to a statutory scheme carried out by an administrative agency. Rather, in *Rathke,* merchants of precious metals and stones brought suit to enjoin the attorney general from enforcing the terms of a criminal statute requiring them to keep records and secure information prior to purchase, as an aid to law enforcement. 648 P.2d at 649–50. *Rathke* is inapposite to the case at bar because there the requested injunction constituted judicial interference with both the legislative and executive branches of government in the exercise of their authority. Here the re-quested relief is for the purpose of enforcing the intent of the General Assembly pursuant to statute.

11. Statutorily prescribed injunctive remedies may vary one from another. Contrast, for example, the mandatory injunctive provisions of the Medical Practice Act, § 12–36–132, 5B C.R.S. (1991), with the temporary restraining order and preliminary injunction provisions of the Air Act, § 25–7–121(2), 11A C.R.S. (1996 Supp.), which provide the court with prescribed discretion to determine whether such temporary or preliminary relief should be accorded to the state.

design is at the heart of our inquiry in this regard. *See Board of Med. Exam'rs v. Court of Appeals*, 920 P.2d 807, 815 (Colo. 1996).

■ In 1994, the General Assembly enacted the Pet Animal Care and Facilities Act, §§ 35–80–101 to –117, 14 C.R.S. (1995), for the purpose of protecting the health of pet animals, their caretakers, and the public. The Act is a comprehensive statute that provides for the licensure and regulation of all pet animal facilities by the Colorado Commissioner of Agriculture. The General Assembly has declared unlawful (1) the performance of "any of the acts of a pet animal facility for which licensure is required without possessing a valid license," § 35–80–108(1)(a), and (2) the refusal "to comply with a cease and desist order issued pursuant to section 35–80–111," § 35–80–108(1)(c). The Commissioner is empowered to "administer and enforce the provisions of this article and any rules and regulations adopted pursuant thereto." § 35–80–109(1).

Section 35–80–111 sets forth the manner in which the Act is to be enforced. Upon a determination that a violation of the statute or rule promulgated thereunder has occurred and immediate enforcement of the Act is "deemed necessary" by the Commissioner, then the Commissioner may cause a cease and desist order to be issued. § 35–80–111(2)(a). The recipient of the cease and desist order may request an administrative hearing, which must be promptly conducted by the agency on request, for the purpose of determining whether the violation has occurred. *Id.* Here, an administrative hearing was not requested by the recipient of the cease and desist order. If a party continues to violate an effective cease and desist order for a period in excess of twenty-four hours, the Commissioner may bring suit for entry of a temporary restraining order and injunction to prevent continuing violation of the order. § 35–80–111(2)(b). The district court may not stay the cease and desist order pending the hearing. § 35–80–111(2)(c).

■ When interpreting a statute our role is to effectuate the meaning and intent of the General Assembly. *May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 976 (Colo.1993). Section 35–80–111 provides that the Commissioner or his designee "shall enforce the provisions" of the Act, and, in the event a cease and desist order is violated, as here, the Commissioner has recourse to the courts to enjoin the violation. Accordingly, the Act empowers the court to "prevent any further or continued violation of this article," § 35–80–111(2)(b), and "to temporarily or permanently restrain or enjoin the act or practice in question and to enforce compliance with this article or any ... order issued under this article," § 35–80–111(3).

The Commissioner, upon showing that a person "has engaged in or is about to engage in" violation of the Act, is not required to plead or prove irreparable injury or inadequacy of a remedy at law when seeking either a temporary restraining order or preliminary or permanent injunctive relief. § 35–80–111(3).[12] The essential issue before the district court here was whether CARI was operating the pet facility without a license in violation of a valid and effective cease and desist order issued under the Act. *See Cavanaugh v. Department of Social Servs.*, 644 P.2d 1, 4 (Colo.1982) (upholding validity of statute and sanctions for unlawful operation of unlicensed facility).

■ CARI argues that the court, under *Rathke*, did not abuse its discretion in refusing to grant the requested relief under the circumstances of this case. We do not agree. Contrary to CARI's argument, *Rathke* does not dictate denial of relief to the Commissioner here. *Rathke* actually employed a

12. Section 35–80–111(3) provides:

Whenever the commissioner possesses sufficient evidence satisfactorily indicating that any person has engaged in or is about to engage in any act or practice constituting a violation of any provision of this article or any rule adopted under this article, the commissioner may apply to any court of competent jurisdiction to temporarily or permanently restrain or enjoin the act or practice in question and to enforce compliance with this article or any rule or order issued under this article. In any such action, the commissioner shall not be required to plead or prove irreparable injury or the inadequacy of the remedy at law. Under no circumstances shall the court require the commissioner to post a bond.

separation of powers rationale in upholding the district court's denial of injunctive relief to restrain enforcement of a criminal statute. The appropriate relationship between the executive and judicial functions was the linchpin to the court's analysis in *Rathke,* as here. We there said that "[t]he constitutional basis for judicial deference in this regard is the doctrine of separation of powers, which serves to restrain one branch of government from usurping or restraining the proper exercise of the powers of another branch." 648 P.2d at 651.

It is true that in *Rathke* we set forth the now familiar six-part test for considering issuance of a preliminary injunction under Rule 65:

> In exercising its discretion, the trial court must find that the moving party has demonstrated:
>
> (1) a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (3) that there is no plain, speedy, and adequate remedy at law; (4) that the granting of a preliminary injunction will not disserve the public interest; (5) that the balance of equities favors the injunction; (6) that the injunction will preserve the status quo pending a trial on the merits.

648 P.2d at 653–54 (citations omitted).

Special statutory procedures may supersede or control the more general application of a rule of civil procedure. *See In re Oxley,* 182 Colo. 206, 210, 513 P.2d 1062, 1064 (1973). We here address a comprehensive enactment which includes a restraining order and injunction provision as an essential feature of the enforcement design of a licensing statute.

The district court determined that attempts to comply with the statute mitigated in favor of allowing the new facility to operate in derogation of the statute's proscription against the operation of an unlicensed facility. In this, the court abused its discretion by placing an unlicensed facility in a more advantageous position than a facility which has initiated a license application and has demonstrated eligibility to hold a license prior to receiving and housing animals.

### B.

The Act anticipates that unlicensed locations at which animals will be newly housed will be subject first to agency licensure proceedings. Administrative safeguards for the applicant are provided. *See* §§ 35–80–111 to –113. An application for a license shall be acted upon promptly under the Administrative Procedure Act (APA). § 24–4–104(8), 10A C.R.S. (1988). The hearing requirements of the APA apply to a decision by the Commissioner to deny a license application. §§ 35–80–109(3), –112(1). If the application for a new license is denied without a hearing, the applicant is entitled to request a hearing and to seek judicial review of an adverse decision. *See* § 24–4–106, 10A C.R.S. (1988 & 1996 Supp.). In the administrative proceedings, the applicant for the license, as proponent of the order sought, bears the burden of proof to demonstrate that it has qualified for the license which is being improperly withheld by the agency. *See* § 24–4–105(7), 10A C.R.S. (1988).

Here, no license application was at issue, and no hearing on refusal of the Commissioner to grant a license for which the facility had qualified was requested. Instead, operation of the facility was commenced in open violation of the statutory provision that it is unlawful and a violation of the Act for any person or entity "to perform any of the acts of a pet animal facility for which licensure is required without possessing a valid license under this article." § 35–80–108(1)(a).

In commencing operation without a license, housing an increasing number of dogs at an unlicensed facility, refusing to comply with the Commissioner's cease and desist order which was designed to enforce the licensure requirement of the Act, and particularly, in successfully securing an order of the court allowing it to continue operation as an unlicensed, non-complying facility, CARI gained a position more advantageous to it than were it an applicant for licensure as contemplated by the statute. Before taking animals into such a facility, a person or entity must demonstrate compliance with the explicit statutory mandate that "[a]ny person operating a

**1336**

pet animal facility shall possess a valid pet animal facility license issued by the commissioner." § 35–80–104.

The Commissioner correctly argues that this statute is straightforwardly designed to avoid such an anomaly between the law-abiding applicant and the unlicensed operator. Throughout the enforcement provisions of section 35–80–111, the General Assembly has demonstrated its intent to provide for the welfare of the confined animals, the safety of handlers, and the protection of the public, by allowing for the prompt resolution of administrative and judicial proceedings. Upon request to the agency, a "prompt hearing" is to be held to determine whether a violation has occurred and the matter is to be "determined promptly." § 35–80–111(2)(a).

The usually applicable discretion to postpone the effective date of agency action under the APA which the court may issue upon a finding of irreparable injury pending judicial review, see § 24–4–106(5), 10A C.R.S. (1988), does not apply pursuant to this statute. When the Commissioner issues a cease and desist order under the Act and the recipient thereof has failed to comply within twenty-four hours, the Commissioner may bring suit for a temporary restraining order and injunctive relief to prevent further violation, § 35–80–111(2)(b), and "[n]o stay of a cease and desist order" is to be issued prior to a court hearing involving the parties, § 35–80–111(2)(c). In the judicial enforcement proceeding the normally applicable irreparable injury and posting of security requirements under Rule 65 do not apply. § 35–80–111(3). Compliance with the Commissioner's order is to be enforced by means of an application "to any court of competent jurisdiction to temporarily or permanently restrain or enjoin the act or practice in question and to enforce compliance" with the statute, rules, and orders of the Commissioner. § 35–80–111(3).

The evident design of this statute is to forward the public interest in protecting animals against placement in inadequately designed and operated facilities, safeguarding their caretakers against unsanitary working conditions, and ensuring the public interest in the proper care and confinement of animals. Contrary to the district court's conclusion, the evidence adduced by the Commissioner at the hearing demonstrated that the Commissioner would succeed in establishing the likelihood of success on the merits of CARI's non-compliance with the statute's licensure requirements. In addition, the evidence demonstrated that the public interest expressed throughout the design of this statute favored issuance of the requested relief. Moreover, the balancing of the equities between a non-licensed, non-complying facility and the Commissioner's role on behalf of the public in ensuring properly licensed facilities, should have been resolved in favor of the Commissioner.

In *Lloyd A. Fry Roofing Co. v. State Department of Health Air Pollution Variance Board,* 191 Colo. 463, 473, 553 P.2d 800, 808 (1976), we determined that, despite the absence of a specific provision dispensing with the irreparable injury requirement, irreparable injury nevertheless need not be shown in order to enjoin continued violation of an enforcement cease and desist order. We reached this conclusion on the basis that the injunction was sought "in behalf of the public" in a suit imbued with "great public importance" to prevent noncompliance which, of itself, was "sufficient injury to the public interest." *Id.*

■ In the statute before us, as contrasted with *Fry* where this court implied the negation of the Rule 65 irreparable injury requirement in the enforcement of the Air Act, the General Assembly specifically dispensed with a burden of proof on the Commissioner to show irreparable injury, demonstrate inadequacy of a remedy at law, and post bond. The remaining *Rathke* elements should not have been employed by the court in a manner which frustrated the state licensure requirements. When the Commissioner demonstrates to the court that he possesses "sufficient evidence satisfactorily indicating that any person has engaged in or is about to engage in" a violation of the Act, § 35–80–111(3), the legislature presumed that a court would act to enjoin the illegal act or practice. Operating a facility without a required license is the clearest prohibition contained in the Act, and in furtherance of the statutory design, commands the court's prompt and effective attention.

■ The district court's action here was neither prompt nor effective. By denying relief to the Commissioner, the court in effect granted to this unlicensed facility an interim operating license not available to it under the Act. The court obviously desired to give CARI enough time to assure licensure: "[T]he Court was persuaded that with additional time the Defendant will be able to bring the current facility into compliance with [the Act] and its required licensure." It then postponed the permanent injunction hearing until the following year "at which time the Court will receive proof as to whether the facility. is properly licensed and in compliance with applicable laws." We conclude that the court thus undertook the agency's role in determining when and how to employ the agency's enforcement discretion as to licensure. However, it is not an appropriate function of the court to act as a licensing agency. *Cf. Maul v. State Bd. of Dental Exam'rs*, 668 P.2d 933, 937 (Colo.1983) ("It is not within the scope of judicial review ... for this court to act as a professional licensing board.").

■ Contrary to the actions of the district court, the statutory context demonstrates that the judicial proceeding on the Commissioner's motion for relief is to focus on whether the cease and desist order was validly issued within the scope of the Commissioner's authority, whether the facility required a license to operate under the Act and the implementing regulations, and whether the facility was operating without a license in violation of the Act and the order. The record demonstrates that the Commissioner possessed and demonstrated "sufficient evidence satisfactorily indicating," *see* § 35–80–111(3), that CARI was operating without the required license. CARI's "equities" in caring for unwanted or abused animals were built in violation of the Act's legal prescriptions which were designed to ensure that such worthy ends are accompanied by a licensed, healthy, and protective environment. Roehr testified at the court hearing that the facilities did not provide adequate protection from the heat and sun, that CARI's introduc-

tion of additional dogs would increase aggression and overcrowding of dogs, and that an adequate perimeter fence, which CARI had agreed to construct, did not exist to prevent the escape of dogs and wolf hybrids, which were also housed at the facility.

Under the facts of this case, the district court incorrectly utilized the balancing of the equities and public interest factors set forth in *Rathke*, which resulted in the continued operation of an unlicensed facility contrary to the Act. In the absence of compelling evidence to the contrary, the public interest, and equitable considerations having to do with that interest, favored enforcement of the statutory licensure requirement. CARI was clearly on notice, by the statute and implementing regulations, and by its prior conduct of a licensed facility at another location, that start-up of another facility at a different location involved compliance with the licensure requirement.

Although the Commissioner allowed several opportunities for the facility to qualify for a license, the Act did not require that he do so, and the record adequately demonstrates the basis and validity of the agency's action in issuing the cease and desist order. Under the circumstances, the district court abused its discretion in denying the requested relief and, in doing so, frustrated the accomplishment by the assigned executive agency of its statutory purpose.[13]

### III.

Accordingly, we make the rule absolute. We return the case with directions to enter the temporary restraining order and preliminary injunction against continued operation of the facility in violation of the cease and desist order, and for further proceedings consistent with this opinion.

SCOTT, J., dissents, and LOHR, J., joins in the dissent.

KOURLIS, J., does not participate.

**13.** Of course, we do not determine whether the facility currently qualifies for a license. This is a matter to be determined by the Commissioner under the Act and the APA, which provide appropriate procedural safeguards and judicial remedies for license applicants.

Justice SCOTT, dissenting:

I respectfully dissent from the majority opinion. First, based on the plain language of section 35–80–111(3), 14 C.R.S. (1995), I do not believe that the General Assembly intended to remove the discretionary authority of the trial court either to grant or deny a preliminary injunction. Also, because the petitioner failed to provide an adequate record, unlike the majority, I am unable to review the trial court's ruling to determine whether the trial court abused its discretion in denying the preliminary injunction or in not setting a timely hearing for a permanent injunction.[1]

## I.

### A.

Section 35–80–111(3) authorizes the Commissioner of Agriculture (Commissioner) to enforce the Pet Animal Care and Facilities Act (Act), §§ 35–80–101 to –117, 14 C.R.S. (1995), by force of a court order enjoining conduct in violation of the Act. That section provides, in relevant part, that

> the commissioner may apply to any court of competent jurisdiction to temporarily or permanently restrain or enjoin the act or practice in [violation of the Act] and to enforce compliance with this article or any rule or order issued under this article. In any such action, the commissioner shall not

be required to plead or prove irreparable injury or the inadequacy of the remedy at law.

§ 35–80–111(3). While the parties before us do not dispute the Commissioner's authority, i.e., that he "may apply" for an order, they do not agree as to the applicable standard for the issuance of a temporary injunction. The petitioners view the language of the statute as commanding the trial court to issue the order whenever a violation is proven. As stated in its order set forth in the majority opinion, maj. op. at 1332–1333, the trial court assumed the statute provided it with discretion as to whether the order should be issued on application by the Commissioner.[2] If the trial court is correct, of course, its order can be set aside on our review for an abuse of discretion appearing in the record on review.

It is beyond peradventure that the granting or denial of a preliminary injunction is a decision which lies within the sound discretion of the trial court. *Evans v. Romer*, 854 P.2d 1270, 1274 (Colo.1993); *Rathke v. MacFarlane*, 648 P.2d 648, 653 (Colo.1982). In exercising that discretion, the trial court must find that the moving party has demonstrated: (1) a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (3) that there is no plain, speedy, and adequate reme-

---

1. Like the majority, I also will treat the trial court's order as a denial of a preliminary injunction and not as the denial of a temporary restraining order.

2. In addition to the portions of the court's order set forth in the majority opinion, the trial court further provided:

> The Court was also persuaded by the testimony of three independent veterinarians who had treated animals from Colorado Animal Refuse [sic] for routine veterinary care that the animals at the facility are well cared for and generally healthy. All three veterinarians had been to the facility and at least one of them had inspected the facility in anticipation of his testimony. The Plaintiff did produce evidence of isolated incidences of trauma to animals but the vast balance of testimony and evidence justify the factual conclusion that the animals are adequately cared for in the current facility.
>
> The Court was not persuaded by the proof of the Plaintiff that the balance of equities favors the imposition of a temporary order. A num-

ber of witnesses testified to statements made by Dr. Keith Roehr that the Defendants would have additional time until the "fall" to bring the facility into compliance. While these statements were contested by the Plaintiff it is clear that latitude had been extended to facilities covered by PACFA because of the recent origin of the legislation. In addition, the Defendants had suffered a catastrophic fire at a previous location and thus faced the prospect of moving an existing animal population into a new facility.

Finally, the Court is not persuaded that the public interest will be served if the temporary order is Granted. The testimony of virtually all witnesses is that Colorado Animal Refuge provides a service for the citizens of this area by providing necessities, shelter and health care to animals while promoting adoptions.

For the foregoing reasons, the Motion for Temporary Restraining Order is Denied.

dy at law; (4) that the granting of a preliminary injunction will not disserve the public interest; (5) that the balance of equities favors the injunction; and (6) that the injunction will preserve the status quo. pending a trial on the merits. *Rathke,* 648 P.2d at 654.

It is unclear from my reading of the majority opinion whether it concludes that the trial court was correct to apply the four controlling factors under *Rathke,*[3] but merely abused its discretion in doing so, *see* maj. op. at 1335 ("the court abused its discretion by placing an unlicensed facility in a more advantageous position . . . ."), or that *Rathke*'s elements are irrelevant because the language of section 35–80–111(3) mandates that, upon evidence of only a violation, the injunction must be issued, *see* maj. op. at 1337 ("the district court incorrectly utilized the balancing of the equities and public interest factors set forth in *Rathke* ").

In my view, the proper standard is a balancing of the factors set out by this court in *Rathke,* as modified by section 35–80–111(3). However, the majority seems to rely upon a different standard when it states:

> Contrary to the actions of the district court, the statutory context demonstrates that the judicial proceeding on the Commissioner's motion for relief is to focus on whether the cease and desist order was validly issued within the scope of the Commissioner's authority, whether the facility required a license to operate under the Act and the implementing regulations, and whether the facility was operating without a license in violation of the Act and order.

Maj. op. at 1337.

In its opinion, the majority recognizes that "the test usually applicable for injunctions under C.R.C.P. 65 is set forth in *Rathke v. MacFarlane* " but nevertheless determines that *Rathke* is inapposite to the instant case. Maj. op. at 1333 & n. 10. The majority, therefore, concludes that section 35–80–111(3) vitiates the trial court's discretion in order "to effectuate properly issued agency

enforcement orders." Maj. op. at 1333. I disagree.

It may be true that, under certain circumstances, the granting of an injunction provided for in the statutory scheme of an administrative agency is mandatory and not within the discretion of a court to deny. *See, e.g.,* 12 Debra Knapp, *Colorado Civil Procedure Forms and Commentary* § 65.3, at 667 (1996) (*"Except where a statute makes injunctive relief mandatory upon a given showing,* the granting or denial of both a temporary restraining order and a preliminary injunction is within the sound discretion of the trial court.") (Emphasis added.) However, no cases in Colorado have yet recognized any such circumstances and the treatise above provides no case law support for its statement.

As the majority effectively illustrates, *see* maj. op. at 1333 n. 11, statutes that intend to make the granting of an injunction mandatory on the trial court do so explicitly. For example, section 12–36–132, 5B C.R.S. (1991), of the Colorado Medical Practices Act, provides that "[i]f it is established that the defendant has been or is committing an act prohibited by said articles, the court shall enter a decree perpetually enjoining said defendant from further committing such act." The language in that statute clearly makes an act of the judicial officer mandatory. *See State Bd. of Med. Exam'rs v. Saddoris,* 825 P.2d 39, 43 (Colo.1992) (the word "shall" indicates a mandatory requirement).

Furthermore, although no cases have interpreted it as such, an additional example of a statute that may be viewed as providing mandatory injunctive relief in the face of an administrative violation is section 1–45–113(2)(a), 1B C.R.S. (1996 Supp.), of the Campaign Reform Finance Act. *See* Knapp, *Colorado Civil Procedure Forms and Commentary,* at 667 n. 6 (interpreting section 1–45–113(2)(a) to provide mandatory injunctive relief upon a showing of a violation of the Campaign Reform Act). That statute provides in pertinent part:

---

3. While I have set forth the six factors since our decision in *Rathke,* in the next to last sentence of section 35–80–111(3), the General Assembly excused the Commissioner from "plead[ing] or pro-

vid[ing] irreparable injury or the inadequacy of the remedy at law." Thus, only four elements of our *Rathke* test remain.

If the secretary of state determines, after a timely hearing, that such a violation has occurred, the secretary of state shall so notify the attorney general who shall institute a civil action for relief, including a permanent or temporary injunction, a restraining order, or any other appropriate order, in the district court.

Although that statute contains the mandatory language "shall," the General Assembly is clearly directing that mandatory language at the attorney general and not at the judicial officer who will preside over the civil action and determine the merits of the injunction or restraining order.

In contrast to the statutes noted above, the language in the statute at issue here, section 35–80–111(3), contains no mandatory language directed either at the Commissioner or at a judicial officer. To the contrary, by its unambiguous terms, the statute authorizes agency action so that the Commissioner "may apply to any court" for injunctive relief without, as the majority would read into the statute, a mandate binding any judicial officer. It is axiomatic that in construing statutory provisions, we should give effect to the intent of the legislature by looking first to the statutory language and giving words and phrases their commonly accepted meaning. *PDM Molding, Inc. v. Stanberg*, 898 P.2d 542, 545 (Colo.1995). Where the language of a statute is plain and the meaning is clear, we need not resort to interpretive rules of statute construction, but must apply the statute as written. *Id.*

In my view, the plain language of section 35–80–111(3) belies any claim that an injunction should issue automatically upon application by the Commissioner. First, the statute expressly states that the Commissioner "may apply" to a court for an injunction. In no way can this term be construed as mandatory, either to the Commissioner or a judicial officer. On the contrary, by its definition, to "apply" for something is "to make a formal request or petition ... to a court ... for the granting of some ... rule or order, which is

within his or their power or discretion." *Black's Law Dictionary* 99 (5th ed. 1979).

Second, the fact that the General Assembly has used specific language in the past to indicate that a court must issue an injunction if certain requirements are met leads me logically to conclude that, because such language was not used in section 35–80–111(3), the General Assembly did not intend to withdraw a court's discretionary powers under *Rathke* and C.R.C.P. 65. *See Lunsford v. Western States Life Ins.*, 908 P.2d 79, 84 (Colo.1995) (when the legislature speaks with exactitude, we must construe the statute to mean that the inclusion or specification of a particular set of conditions necessarily excludes others); *see also Blue River Defense Committee v. Town of Silverthorne*, 33 Colo. App. 10, 12, 516 P.2d 452, 455 (1973) (courts should not presume that the legislature used language in a statute idly and with no intent that meaning should be given to it). Thus, the express language of the statute would not support the majority's position that the court had no discretion in determining whether to grant or deny the injunction.[4]

### B.

Moreover, the statute specifically excepts the requirements of pleading irreparable injury and the inadequacy of a remedy at law—two factors that we can assume come from our decision in *Rathke*. *See State Eng'r v. Castle Meadows, Inc.*, 856 P.2d 496, 499 (Colo.1993) (when the General Assembly adopts legislation, it is presumed to be cognizant of judicial precedent relating to the subject matter under inquiry). Although these two *Rathke* factors are not to be considered, four other factors remain. Importantly, one of those four factors is the consideration of "the balance of equities," which by its very nature is discretionary.

And, although the majority states that *Rathke* is inapposite because it does not involve "a comprehensive enactment which includes a restraining order and injunction provision as an essential feature of the enforcement design of a licensing statute," maj.

---

4. I also note that the majority's conclusion here threatens judicial independence under our distribution of powers (separation of powers) provi-

sion set forth in Article III of the Colorado Constitution.

op. at 1335, that distinction is not meaningful. We have consistently determined that the factors set forth in *Rathke* should be applied by a court when considering a motion for a preliminary injunction under a variety of circumstances. *See, e.g., Evans v. Romer,* 854 P.2d 1270, 1273 (Colo.1993); *City of Colorado Springs v. Blanche,* 761 P.2d 212, 217 (Colo.1988); *Johnson v. Jefferson County Bd. of Health,* 662 P.2d 463, 470 (Colo.1983).

Therefore, the plain language of the statute at issue does not support the majority's view that the trial court had no discretion in refusing to order an injunction.

## II.

### A.

Although seemingly contradictory with most of its analysis, the majority also states that the trial court abused its discretion in not issuing the injunction. Maj. op. at 1335 & 1337. Nevertheless, in my view, it is not necessary for us to reach the merits of this issue because the petitioner has failed to provide an adequate record to support that conclusion.

It is incumbent upon the moving party to designate all those portions of the record necessary for appeal. *Hock v. New York Life Ins. Co.,* 876 P.2d 1242, 1252 (Colo.1994). Here, however, petitioner has not included those portions of the record that might counter the trial court's finding that the balance of the equities favored denying the injunction. Petitioner relies only upon the undisputed fact that section 35–80–111(3) was violated, which is insufficient. Likewise, the majority fails to demonstrate that the trial court's findings are not supported in the record and incorrectly collapses the *Rathke* factor of balancing the equities into the fact that the statute was violated.

Thus, because the portions of the record before us are not complete and do not evince the equities that would support the issuance of the injunction, we must accept the trial court's findings and conclusions as correct. *Hock,* 876 P.2d at 1252 ("An appellate court must presume that the trial court's findings and conclusions are supported by the evidence when the appellant has failed to provide a complete record.").

### B.

The majority also implies that the trial court abused its discretion or exceeded its authority by postponing the permanent injunction hearing until the following year. The majority states:

> The district court's action here was neither prompt nor effective. By denying relief to the Commissioner, the court in effect granted to this unlicensed facility an interim operating license not available to it under the Act.... We conclude that the court thus undertook the agency's role in determining when and how to employ the agency's enforcement discretion.

Maj. op. at 1336–1337.

However, nothing in the record before us indicates that the petitioner objected to the timing of that hearing. Thus, because the petitioner did not raise the issue below, we should not consider it for the first time here. *Christensen v. Hoover,* 643 P.2d 525, 531 (Colo.1982) (an issue not raised before the decision maker below should not be addressed on appeal).

Accordingly, for the reasons stated above, I respectfully dissent to the majority opinion.

LOHR, J., joins in this dissent.